# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| ADAM WEINBERG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 12-cv-09846 |
| | ) | |
| WILLIAM BLAIR & COMPANY, LLC | ) | Judge Sharon Johnson Coleman |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Adam Weinberg ("Weinberg") filed a complaint alleging employment discrimination on the basis of race and religion against Defendant William Blair & Company, LLC ("William Blair"). Weinberg claims William Blair failed to stop discriminatory harassment and then terminated him because he is Jewish and in retaliation for complaining about the harassment. William Blair moves for summary judgment on all claims. For the reasons stated below, the Court grants in part and denies in part the motion.

**Background**

The following facts are undisputed except where noted. Weinberg began working for William Blair in its Chicago, Illinois office in May 2000 as a sales associate and was promoted to partner in 2007. Dkt. 118 at 1-2. As a member of the sales department, Weinberg's role was to service institutional investors by providing them access to the firm's resources which would help them make investment decisions, including access to William Blair's research analysts and access to meetings with management-level employees of publicly traded U.S. companies. *Id.* at 4-5. In 2007, John Moore ("Moore") became manager of Weinberg's department. *Id.* at 6. Because most of his clients were in the New York region, Weinberg was also managed in part by Liam Healy ("Healy"), who managed the New York region. *Id.* at 6. Healy was subordinate to Moore. *Id.* at 7. Healy and

Weinberg butted heads over Healy's perception that Weinberg did not follow the rules for scheduling meetings for his clients. *Id.* at 12-13. Healy required Weinberg to report his schedule and whereabouts directly to Healy, a requirement not imposed on any other partners, Dkt. 124 at 9, and admonished him if he wouldn't do so, Dkt. 118 at 14. Weinberg heard from colleagues that Healy was attempting to collect negative information about Weinberg from research analysts and other co-workers. Dkt. 124 at 12-13. Weinberg felt he was being singled out by Healy because he was the only Jewish salesperson in the department. Dkt. 124 at 9. William Blair disputes that Weinberg has personal knowledge or evidence of the religious backgrounds of all the other salespersons in the department. *Id.*

At various points during his employment at William Blair from 2000 to 2011, Weinberg's colleagues made several comments which Weinberg perceived as mocking, insulting, or remarking on his Jewish identity. Dkt. 124 at 10-11. Specifically, in 2008 Weinberg complained he was being harassed, discriminated and retaliated against because he is Jewish. *Id.* at 19-20. A partner at William Blair, Fred Fisher ("Fisher") told John Smith ("Smith"), the head of Human Resources, that Healy "was bullying" Weinberg. Dkt. 124 at 8. William Blair investigated Weinberg's complaint and concluded that no discrimination or harassment on the basis of Weinberg's Jewish identity had occurred. Dkt. 118 at 19-20. After the investigation, Weinberg submitted to John Smith ("Smith"), the head of Human Resources, a letter expressing his disappointment and disagreement with the outcome of the investigation and maintaining he was being discriminated against because he is Jewish. *Id.* at 23.

In July 2010, Weinberg and a research analyst, Jason Ader ("Ader"), who is also Jewish, had a conflict over a client meeting. *Id.* at 25. As a result of this conflict, Weinberg sent several emails to Ader expressing dissatisfaction with the way Ader allotted slots to clients for the meeting. *Id.* In October 2010, Ader and Weinberg again had a conflict, this time over an incident in which

2

Weinberg requested that Ader call one of Weinberg's clients and felt that Ader did not timely relay to Weinberg the result of that call. *Id.* at 26. Ader complained to Moore that an email Weinberg sent to Ader about this conflict was unprofessional and inappropriate, and told Moore he would no longer work with Weinberg. *Id.*

In January 2011, Moore spoke to Weinberg about an alleged conflict Weinberg had with Jennifer Hilding ("Hilding"), an administrative assistant. *Id.* at 29. The specifics of the conflict between Hilding and Weinberg are disputed. William Blair contends that Hilding was asked to step in and help Weinberg submit expense reports because Weinberg's regular assistant did not complete the expense reports before going on a long vacation. *Id.* at 27. William Blair then contends that Hilding became upset because of the way Weinberg treated her and refused to complete the expense reports, and later complained to Moore about the incident, with tears in her eyes. *Id.* at 28. Weinberg agrees that neither his regular assistant nor Hilding helped him complete the expense reports, but disputes the rest of William Blair's characterization of the incident. *Id* at 27-29. Weinberg agrees that Moore spoke to Weinberg about an "alleged incident" with Hilding. *Id.* at 29.[1]

In February 2011, research analyst Ralph Schackart ("Schackart") cancelled a meeting that Weinberg had offered to one of his clients. *Id.* at 31. Weinberg contends that Healy "set-up" Weinberg to be in a compromising position with respect to his client because it was Healy who told Weinberg that Schackart had authorized booking Weinberg's client for the meeting. *Id.* at 32. Schackart complained to Moore about the tone of an email Weinberg sent to Schackart in the aftermath of the cancelled client meeting and forwarded the email to representatives in the compliance and legal department. *Id.* On March 1, 2011, Weinberg and Moore had a meeting. *Id.* at

---

[1] Weinberg neither disputed nor admitted to William Blair's statement that "Hilding brought her concerns to Moore," but contends that Moore's testimony as to what Hilding told him is inadmissible hearsay. However, the Court may consider Hilding's purported statements not for the truth of their content, i.e., that Weinberg mistreated Hilding, but for their affect on Moore, i.e., that Moore received a complaint about Weinberg, whether or not the substance of the complaint was accurate. *See, e.g., Woods v. City of Chicago*, 234 F.3d 979, 986 (7th Cir. 2000).

3

32. William Blair contends that it was a meeting to discuss Weinberg's unreasonable requests of Schackart in the aftermath of the cancelled client meeting. *Id.* Weinberg contends, but William Blair disputes, that at this meeting Weinberg complained of continued harassment, discrimination and retaliation. *Id.* at 33, 48.

On March 2, 2011, Weinberg sent an email to Moore. *Id.* at 33. William Blair characterizes the email as laying out Weinberg's concerns that he was being "mistreated" by Healy. *Id.* at 33. Weinberg characterizes the email as a confirmation of his complaint of discrimination, harassment, and retaliation on the basis of his Jewish identity. *Id.* Sometime between March 3 and March 7, Moore decided Weinberg should be terminated, and discussed this with the CEO of William Blair, John Ettelson. *Id.* at 34-35. On March 7, Simon from Human Resources told Weinberg he was terminated. *Id.* at 36. On December 13, 2011, Weinberg filed a charge with the EEOC for discrimination because he is Jewish and for retaliation. *Id.* The EEOC issued a right to sue letter on January 19, 2011. *Id.*

Weinberg then filed a complaint with this Court, bringing claims for discrimination, retaliation, and hostile work environment under Title VII and 42 U.S.C. §1981.[2] William Blair now moves for summary judgment on all claims.

**Legal Standard**

Summary judgment is appropriate if the evidence shows that there is "no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment has the "initial responsibility" to show that there is no genuine issue of material fact, *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986), but the Court must view all facts and make all reasonable inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). The Court views all evidence

---

[2] Section 1981 and Title VII claims are analyzed in the same manner and thus are appropriately considered together. *Eiland v. Trinity Hosp.*, 150 F.3d 747, 750 (7th Cir. 1998). The Court will do so here.

and draws all inferences in favor of the non-moving party, and may enter summary judgment only if the record as a whole establishes that no reasonable jury could find for the non-moving party. *Michas v. Health Cost Controls of Ill., Inc.,* 209 F.3d 687, 692 (7th Cir.2000).

**Discussion**

*1. Retaliation Claim*

William Blair argues that Weinberg's retaliation claim fails because he cannot show that his protected activity was the "but-for" cause of his termination as required under *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2533 (2013). In support of its argument, William Blair contends that the undisputed facts demonstrate that Weinberg was terminated because of complaints from colleagues, namely Ader, Hilding, and Schackart, about Weinberg's attitude and behavior.

"The requirement of but-for causation in retaliation claims does not mean that the protected activity must have been the only cause of the adverse action. Rather it means that the adverse action would not have happened without the activity." *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 n.1 (7th Cir. 2014). Consequently, the undisputed fact that three employees complained about Weinberg to Moore in the months preceding Weinberg's termination does not defeat Weinberg's claim. He may still be able show he would not have been terminated absent his actions opposing discrimination on March 1 and 2, 2011. To create a triable issue as to causation on his retaliation claim, Weinberg must present a "convincing mosaic" of circumstantial evidence permitting an inference that William Blair terminated him because of his protected activity. *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994).

The Seventh Circuit recognizes three types of circumstantial evidence a plaintiff may use to create his "convincing mosaic" of retaliation: "(1) evidence of suspicious timing, (2) evidence that similarly situated employees were treated differently, and (3) evidence that the employer's proffered reason for the adverse employment action was pretextual." *Castro v. DeVry Univ., Inc.*, 786 F.3d 559,

5

565 (7th Cir. 2015). A single category of circumstantial evidence can by itself preclude summary judgment if the evidence is sufficiently strong. *Id.* Here Weinberg asserts that the following types of evidence support the causation prong of his retaliation claim: 1) suspicious timing; 2) "ethnic slurs, negative stereotyping and use of code words"; 3) disparate treatment of him and similarly situated sales people "who were not Jewish"; and 4) pretext.

The court does not agree that all four categories described by Weinberg are relevant to his retaliation claim. A particular remark may be evidence of a discriminatory or retaliatory intent if it is "(1) made by the decision maker (2) around the time of the decision, and (3) in reference to the adverse employment action." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007). Of the comments made by William Blair employees that Weinberg identified as negative and offensive remarks regarding his Jewish identity, only one was made by Moore. Dkt 118 at 45. Moore described Weinberg as "sneaky," "greedy," and "money-grubbing," terms sometimes used to portray a negative stereotype of Jewish individuals, but there is no evidence that Moore made this comment around the time or in reference to the termination decision. Second, the appropriate comparators for a retaliation claim are not similarly situated non-Jewish employees, as Weinberg argues, but rather similarly situated employees who did not engage in protected activity. *See, e.g, Moultrie v. Penn Aluminum Int'l, LLC*, 766 F.3d 747, 755 (7th Cir. 2014). Finally, Weinberg's argument that pretext could be inferred from the totality of the evidence and a positive 2009 performance review does not demonstrate that the proffered reason for termination, negative complaints from co-workers occurring after 2009, is "unworthy of credence," "a lie," or "lacks a factual basis." *Filar v. Bd. of Educ. of City of Chicago*, 526 F.3d 1054, 1063 (7th Cir. 2008); *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000).

Nonetheless, an extremely short interval between a complaint of discrimination and a termination action is sufficiently strong circumstantial evidence of causation to raise a triable

6

question of fact. *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009). Here, Weinberg's claimed protected activity occurred on March 1 and 2, 2011, and Weinberg was informed he was terminated on March 7, three business days later. Like the plaintiff in *Casna*, Weinberg's "failings as an employee may have prompted the discharge, but so [too] may have . . . intolerance of [a] complaint about discrimination." *Id.* Given the proximity in time between Weinberg's protected activity and his termination, it is for a fact-finder to determine whether Weinberg's complaint of discrimination was a "but-for" cause of his termination.

*2. Discrimination Claim*

William Blair moves for summary judgment on Weinberg's discrimination claim on the basis that Weinberg cannot meet his burden under either the direct or indirect method of proving discrimination. Rather than analyzing the same pieces of evidence twice under each method, it is appropriate here to "collapse" the tests "into one" and determine whether "a rational jury could conclude that the employer took [an] adverse action on account of" the plaintiff's protected class. *Coleman v. Donahoe*, 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J., concurring). *See also, Chaib v. Indiana*, 744 F.3d 974, 985 (7th Cir. 2014) (the Seventh Circuit has endorsed a "broader totality-based view" of employment discrimination claims); *Good v. Univ. of Chicago Med. Ctr.,* 673 F.3d 670, 680 (7th Cir. 2012) (a court may "look away from the intricacies of the direct and indirect methods here and focus on the summary judgment evidence as a whole"). Looking at the record as a whole, the Court finds that even if all factual disputes were resolved in Weinberg's favor, a reasonable fact-finder could not find that Weinberg's termination was motivated by a discriminatory animus towards Weinberg because he is Jewish.

Weinberg relies on the same evidence set forth in support of his retaliation claim to support his discrimination claim. Dkt. 117 at 20. To the extent that evidence put forth in support of the retaliation claim is relevant to the discrimination claim, it is not relevant in identical ways. The anti-

discrimination and anti-retaliation provisions of Title VII "differ not only in language but in purpose as well." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006).

For example, the evidence of suspicious timing that allows Weinberg's retaliation claim to go before a fact-finder is less relevant to a claim that Weinberg was terminated on account of being Jewish. A reasonable jury could find in favor of Weinberg on the retaliation claim by concluding from the short interval between the complaint and the termination that Moore was fed up with Weinberg's complaints about discrimination, which Moore perceived as Weinberg's "unique inability to 'let it go.'" Dkt 99 at 21. But this standing alone says very little about Moore's feelings towards Weinberg *as a Jewish individual*. The sole derogatory comment made by Moore is insufficient evidence that the termination was motivated by discriminatory animus because there is no evidence the comment was made around the time or in reference to the termination decision.

Although Moore is the individual who decided that Weinberg should be terminated, Weinberg disputes that only Moore's attitude and conduct are relevant to his discrimination claim. Weinberg asserts that under the "cat's paw theory", evidence of Healy's discriminatory animus must be also considered because Healy "communicated daily with Moore and was intimately involved" in creating the conflict between Schackart and Weinberg that related to Schackart's complaint to Moore about Weinberg. Dkt. 117 at 21.

Liability under the cat's paw theory arises when a non-decision-making employee, motivated by discriminatory animus, proximately causes the adverse employment action. *Miller v. Polaris Labs., LLC*, 797 F.3d 486, 491 (7th Cir. 2015). It is possible for an employee to proximately cause a co-worker's termination by sabotaging their work performance. *Id.* Here however, Weinberg's contention that Healy sabotaged him by telling him that Schackart had authorized the meeting for Weinberg's client, when apparently Schackart had not, is unrelated to the complaint about Weinberg's performance that played a role in his termination. William Blair does not contend that

8

Weinberg erred by promising his client a meeting that was ultimately canceled. Rather, Moore contends that Weinberg's inability to work cooperatively, as demonstrated in part by Schackart's complaint regarding Weinberg's handling of the cancelled meeting, influenced the termination decision. Even if Healy manufactured the conflict between Weinberg and Schackart, there is no evidence that Healy influenced or encouraged Schackart to complain to Moore about how Weinberg handled the conflict. Furthermore, Healy communicating routinely with Moore about Weinberg's performance is insufficient to show that Moore would not have independently concluded that Weinberg should be terminated. Because a reasonable fact-finder could not conclude from the evidence that Healy proximately caused Weinberg's termination, evidence of Healy's purported discriminatory animus will not be considered with respect to Weinberg's discriminatory termination claim.

Weinberg also puts forth evidence of disparate treatment amongst similarly situated employees to support his discrimination claim, arguing that he, as the only Jewish member of the sales team, was uniquely isolated from resources, subject to special rules, and closely monitored. Dkt. 117 at 15. Comparing the treatment of similarly situated employees requires that the individuals being compared share "enough common features … to allow [for] a meaningful comparison." *Argyropoulos v. City of Alton*, 539 F.3d 724, 735 (7th Cir. 2008). Here, Weinberg fails to identify a comparable employee that colleagues also complained about to Moore or another supervisor with decision-making power. Ader, Hilding, and Schackart's complaints to Moore about Weinberg are a "critical independent variable" which precludes meaningful comparison between the treatment of Weinberg and other salespersons at William Blair. *Id.*

In light of the scant evidence that Moore harbored a discriminatory animus towards Weinberg as a Jewish individual, combined with the undisputed evidence that three of Weinberg's colleagues

9

complained to Moore about Weinberg, a reasonable fact-finder could not find that Weinberg was fired because he is Jewish. Thus, Weinberg's discrimination claim fails.

*3. Hostile Work Environment*

William Blair contends that Weinberg's hostile work environment claim also fails because the alleged conduct is not sufficiently severe or pervasive and because the alleged derogatory comments identified by Weinberg are time-barred.

In order to prevail on a hostile work environment claim, Weinberg must point to evidence that severe and pervasive conduct created a "subjectively and objectively offensive" work environment for which the employer can be held liable. *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 912 (7th Cir. 2010). When determining whether the conduct is sufficiently severe or pervasive to be actionable, a court should consider the following factors: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 552 (7th Cir. 2002).

Weinberg identifies twelve comments made by William Blair employees which he perceived as derogatory towards Jewish people. Two of the comments occurred in 2006. An employee remarked that Weinberg "can't live in Forest Park" and "must live in Highland Park." Dkt. 118 at 39. Another employee likened the office to a cruise ship and himself to a cruise director, and remarked that if he were to take a survey of the "guests" (meaning other William Blair employees), they wouldn't want Weinberg in their club. *Id.* at 40, 47. Five of the comments occurred in 2007. Healy mocked Weinberg's mannerisms that were "unique to Weinberg's Jewish ancestry" and told Weinberg he should be in the movies. *Id.* at 39, 46. Another employee asked Weinberg if he was related to Sandy Koufax because he looked like him. *Id.* A different employee remarked that Weinberg's ancestors "didn't come over on the Mayflower." *Id.* Weinberg heard from a colleague that Healy had stated

10

Weinberg was not "of pure heart." *Id.* at 46. And another colleague told Weinberg that the conflict in the Middle East was the fault of the Jews. *Id.* at 40. Around 2008, when discussing the financial crisis, a coworker remarked to Weinberg, "I see what your buddies and tribesmen did to Bear Stearns" and referred to Goldman Sachs as "the devil." *Id.* At other points in time, Moore and Healy called Weinberg "selfish, aggressive, money-grubbing, sneaky, greedy, and an asset-hog;" Weinberg's assistant said "screw you and your holiday" and told Weinberg he should get his Passover Seder meal "to go from McDonald's;" a colleague's remarked that the suburb in which he lived had in the past prevented Jewish individuals from purchasing homes; and a coworker referred to the company as a "good old boys club." *Id* at 45-47.

These comments range from overtly insulting ("screw you and your holiday") to potentially offensive microagressions whose true meaning depends greatly on context. For example, remarking that Weinberg looks like the Jewish baseball player Sandy Koufax may have been a coded suggestion that all Jewish individuals look alike. On the other hand, the commenter may have sincerely believed Weinberg and Koufax bear a resemblance and may have been genuinely attempting to compliment Weinberg. Many of the comments could be found objectively offensive simply because they were irrelevant remarks on Weinberg's Jewishness whose sole purpose was to make him feel like an outsider. Nonetheless, even if considered under the most offensive possible interpretation, the comments lack sufficient severity. On the spectrum of "physically threatening or humiliating" statements to "mere offensive" utterances, the bulk of the remarks lie much closer to the latter than the former. This coupled with their sparseness compels the conclusion that they did not create a hostile work environment actionable under Title VII or Section 1981.

Because the court finds the comments are not sufficiently severe or pervasive enough to create a hostile work environment, it will not reach the parties' arguments regarding the timeliness of the claim.

**Conclusion**

For the foregoing reasons, Defendants' motion for summary judgment [91] is granted in part and denied in part. Weinberg's discrimination and hostile work environment claims in counts I, II, V, and VI of his complaint are dismissed.

IT IS SO ORDERED.

_____
SHARON JOHNSON COLEMAN
United States District Judge

DATED:  September 30, 2015